**UNITED STATES of America**

v.

**Daniel SANGEMINO, Defendant.**

**No. 00 CR. 554(DC).**

United States District Court,
S.D. New York.

April 3, 2001.

17 U.S.C. § 505. This issue will be addressed after the submission of supplemental memoranda.

Mary Jo White, United States Attorney for Southern District of New York, by David Esseks, Assistant United States Attorney, New York City, for United States.

Carro, Velez, Carro & Mitchell, LLP, by Peter E. Quijano, New York City, for Defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

In this case, defendant Daniel Sangemino has pled guilty to conspiracy to commit securities fraud, mail fraud, and wire fraud in violation of 18 U.S.C. § 341. He is before the Court for sentencing. The sole issue with respect to his sentencing range is whether he should receive a two-level increase in his offense level pursuant to Sentencing Guidelines § 3A1.1(b)(1) because one of the victims—an elderly widow—was a "vulnerable victim." Sangemino objects to the enhancement; he contends that because he was engaging in "cold calling" when he contacted her, he did not know that she was elderly or a widow or that she was in any way "vulnerable."

I held an evidentiary hearing on the issue of the proposed enhancement on March 19, 2001. For the reasons set forth below, Sangemino's objection is overruled. I will apply the two-level increase. The following constitute my findings of fact and conclusions of law.

## BACKGROUND

The indictment in this case charged Sangemino and seventeen co-defendants with conspiracy, securities fraud, and wire fraud. Sixteen of the defendants, including Sangemino, pled guilty. The only two defendants to go to trial—Greg Murray and Carlton Crawford—were convicted by a jury, although Crawford was acquitted on one count.

### A. The Facts

The facts set forth below are drawn from the evidence presented at the March 19th hearing, Sangemino's presentence report, the parties' submissions, and the evidence presented at the trial of Murray and Crawford.

#### 1. The Conspiracy

Beginning in 1997, Sangemino, his co-defendants, and others not named in the indictment engaged in a broad conspiracy to fraudulently sell securities. Operating a series of "boiler rooms" on Wall Street and Broadway in lower Manhattan, the defendants and others sold purported stock in First Fidelity Financial Corporation ("First Fidelity"), Exchange On-Line, and other companies to investors all over the country. Using "lead" cards and lists of potential investors, Sangemino and others made "cold calls" to solicit investments. In the telephone calls, defendants falsely represented that the companies were about to engage in IPO's (initial public offerings) or were "going public," and they used high pressure tactics to induce prospective investors to invest. The typical pitch falsely represented that time was of the essence and that if the potential investor did not act immediately, he or she would lose the opportunity to make a quick

and substantial profit. The calls were made by individuals (including Sangemino) who were not licensed and who falsely identified themselves as the chief executive officer of the company. To give the transactions an appearance of legitimacy, defendants sent interested individuals brochures, subscription agreements, and sham private placement memoranda.

In fact, the transactions were not legitimate. There were no public offerings, and the companies in question never went public. Indeed, the companies had no legitimate business at all. Nonetheless, the defendants and their co-conspirators succeeded in inducing customers to invest more than $3 million. Dozens of individuals—members of the general public with no ties, for the most part, to the defendants—made investments in amounts ranging from $500 to $50,000, with most of the investments in the range of $1,000 to $2,000. The proceeds were then simply used to pay, in addition to expenses of the operation, illegal commissions to the unlicensed "brokers" or "cold callers," with the balance going to the principals of the purported companies.

### 2. *Sangemino's Sales to Openshaw*

Sangemino was a member of the conspiracy and a cold caller from approximately April 1998 until approximately October 1998. He obtained "leads" from lists provided by a "lead company." He would call one lead after another, until a "lead" would show some interest in his sales pitch. He was able to obtain investments from only two investors. One of those investors was Darlene Openshaw.

Sangemino first reached Openshaw in late April or early May 1998. He told her that he was "Bruce Follick," the president of First Fidelity, a company in New York. He represented (falsely) that the company had $50 million in assets. He said that he could sell her private placement stock for $10 a share, that the stock was already worth $12 a share, and that it was a "great deal." He started calling her often, at times virtually every day. (Tr. at 8).[1]

Eventually, Sangemino persuaded Openshaw to make eleven separate investments for a total of $149,000, as follows:

| Date | Amount |
| --- | --- |
| 5/7/98 | $ 5,000 |
| 6/1/98 | 4,000 |
| 6/16/98 | 10,000 |
| 7/8/98 | 10,000 |
| 8/3/98 | 10,000 |
| 8/13/98 | 4,000 |
| 8/13/98 | 20,000 |
| 8/21/98 | 20,000 |
| 8/25/98 | 16,000 |
| 9/8/98 | 21,000 |
| 9/14/98 | 29,000 |
| Total: | $149,000 |

(*See* DX A). Openshaw received confirmations for at least some of the investments; the confirmations were unprofessional looking, as the names were misspelled and the account numbers did not match. (Tr. at 7). The companies in question never went public; Openshaw never received any stock; and none of the money was ever returned to her.

At the time she made the investments, Openshaw was 79 years old, a widow, and lived alone. To raise the money that she sent to Sangemino, Openshaw exhausted her savings, liquidated certain investments that she had in blue chip stocks, sold some family property, and even took out a loan. (Tr. at 7, 8–9, 11, 30; *see also* PSR ¶ 56).

---

1. References to "Tr." are to pages of the transcript of the hearing conducted on March 19, 2001.

### 3. The Tape Recordings

In or about late October or early November 1998, Openshaw's son saw some of the confirmations in his mother's kitchen. He had not known that his mother was investing such substantial sums, and he immediately became concerned, in part because of the suspicious appearance of the confirmations. He believed his mother was "fragile," and he was concerned about her emotional state. Consequently, he placed a voice-activated tape recorder on her telephone. (*Id.* at 7–8). Four tapes were made; these were received into evidence at the hearing, over defense counsel's objection.

Tape 1 (GX 1) is dated November 5 and 6, 1998. It contains two conversations: the first is between Openshaw and her daughter; the second is between Openshaw and Sangemino.

Tape 2 (GX 2) is dated November 12, 1998. It also contains two conversations: the first is between Openshaw and Sangemino; the second is a brief conversation between Sangemino and Openshaw's son.

Tape 3 (GX 3) is dated November 13, 1998, and contains one conversation between Openshaw and Sangemino.

Tape 4 (GX 4) is dated November 16, 1998, and also features one conversation between Openshaw and Sangemino.

On November 6, 1998, Openshaw's son spoke with an investigator from the Utah Department of Commerce, Division of Securities. He advised the investigator that his mother was not aware that he had placed a recording device on the phone. The investigator told the son that he would have to tell Openshaw about the recording device. That afternoon or evening, the son spoke with Openshaw, told her about the recording device, and expressed his concerns about "Bruce Follick." (GX 3512–YYY).

It is clear, from this information and the tone of Openshaw's voice in the different conversations, that she was not aware of the recording device and had not yet been alerted to her son's concerns when she spoke with Sangemino during the conversation on Tape 1. She speaks in a bright, pleasant, happy tone, similar to the tone of her voice in her conversation with her daughter, and appears to be genuinely happy to hear from Sangemino. In the conversations recorded on the three remaining tapes, her voice has a completely different tone, as she appears distressed and on the verge of tears.[2]

Openshaw's conversation with her daughter is unremarkable, although it does suggest that Openshaw was preoccupied with the prospect of making money quickly. She talks to her daughter about sweepstakes, trying to win a car, winning $120,000 a year in a sweepstake, and making money on stocks. She speculates that if she went to Las Vegas she could win a thousand dollars a week. Her daughter

---

**2.** Defense counsel argues that the tapes have little probative value because Openshaw had been alerted to the possibility that she had been defrauded by Sangemino and that she was therefore play-acting. Defense counsel is probably correct, with respect to the last three tapes, that Openshaw was role-playing. On Tape 4, at the end of the conversation, she is clearly trying to get Sangemino to describe again what he intends to do. When he refuses to talk further and hangs up, Openshaw laughs and says "darn!" (GX 4).

Nonetheless, the tapes are highly relevant. The first tape, in particular, tells us a great deal about the relationship between Sangemino and Openshaw. Although the conversations occur after the investments had already been made, they demonstrate, unequivocally, that Sangemino took advantage of Openshaw by building up her trust and capitalizing on her simple desire to talk to a friend.

warns her, more than once: "Don't expect something for nothing." (GX 1).[3]

Openshaw's conversation with Sangemino—before she was alerted to the possibility of fraud—is revealing. It shows a surprisingly close relationship between the two. Openshaw starts by saying she "wondered" why Sangemino—who she refers to as "Bruce" at one point—had not called her, and he responds that he had called three days in a row but got either no answer or Openshaw's son. At one point Openshaw asks Sangemino about his "little boy," and complains that she does not yet have a picture of him.[4] Openshaw says, "I kind of missed you when you don't call," and talks about visiting him in New York. Sangemino tells her that when she visits she will sit down with him in his conference room, and she responds: "Are you that popular that you have a conference room?" Sangemino replies: "Huge."

During the conversation Sangemino repeatedly prods Openshaw about investing more money. He asks: "What do you have in liquid cash?" When she responds that she owes a lot of money in bills, he again asks: "You don't have any liquid cash?" He asks how much she has in insurance, which she apparently has been trying to liquidate, and she tells him $36,000 or $40,000. Later, he again asks: "So what do you have, $36,000?" At another point, he asks Openshaw whether she was "still holding Nabisco."

During the conversation, Openshaw expresses concern about all her bills. Sangemino tries to reassure her. "Everything is going to be all right," he says. At one point, she talks about sweepstakes and how "they might be a scam." He responds, "Yes, [they] might be a scam." Later, she asks about the confirmations: "As long as I have the confirmations, I'm all right, right?" He responds: "I sent you every single one. You have the confirmations. I do them myself."

In the next three conversations, as noted, Openshaw's voice changes as she takes on a concerned, indeed anguished, tone. In the November 12, 1998, conversation (GX 2), she tells Sangemino that she is "down in the dumps" because she is worried about her bills. Yet, he still pushes for further investments. He tells her that Exchange On–Line has gone from $17 to $44 a share and that he tried to call her, because "we would've been liquid real fast." He asks: "Do you think you can get some money together so we can get you into that company real quick?" Even when she tells him that she is "completely broke" and that she has been "crying" because she is "worried," he responds: "Are you telling me you drained everything out? What about Nabisco?"

When she asks about the $150,000 that she has invested with him, he responds "we're going to take care of it." She asks him "when are you going to take care of it?" He replies, "As soon as we go public." At one point, when Openshaw complains that she was "done for" because she did not have "any money," Sangemino purports to reassure her: "I don't care, I still like talking to you. I don't care if you have no money or not; we'll still be friends." Openshaw speculates that she is going to have to see a psychiatrist, and Sangemino says "I'll be your psychiatrist."

---

3. Transcripts have not been made of the tapes. The descriptions of the conversations, including quotations, are based on the Court's own review of the tapes.

4. In one of their earlier conversations, Sangemino must have told Openshaw that he had a son. As the presentence report shows, however, Sangemino has no children. (PSR ¶ 107).

Near the end of this conversation, it is apparent that Sangemino is starting to suspect that Openshaw is becoming suspicious. He says to her: "You're thinking negativity about me, I can feel it. If I was going anywhere, I would've left already with your money." She asks for a monthly statement for her stocks, saying she needs it for her CPA. At that point Sangemino ends the telephone call.

The third call is brief. Openshaw appears to be crying and tells Sangemino that she is sick. She asks for some money back so that she can pay her bills. Sangemino says "maybe I can figure something out," and tells her that he will call her back.

In the last conversation, Openshaw again asks for her money back. Sangemino asks, "How much?" Openshaw says, "I don't know; I'll take it all," and Sangemino responds: "All of it?" He later asks, "Are you serious? Why do you need it all?" Still, Sangemino cannot resist trying again to induce Openshaw to invest more money, as he starts talking again about Exchange On–Line. When Openshaw states that "my boy might die if I don't get this money for the operation," he starts to realize that she suspects wrongdoing. When she asks Sangemino to say again what he was going to do, he ends the telephone call.

## B. *The Guidelines Calculation*

On October 23, 2000, Sangemino pled guilty to count one of the indictment, which charged him with conspiracy to commit securities fraud. In the plea agreement, Sangemino and the Government stipulated that the base offense level was "at least" 15 and that the criminal history category was III. The Government reserved the right to advocate the application of the "vulnerable victims" enhancement, and Sangemino reserved the right to oppose it.

If the two-level enhancement applies, as the Government and the Probation Department urge, the total offense level is 17 and the sentencing range would be 30 to 37 months. If the enhancement does not apply, as Sangemino contends, the total offense level would be 15 and the sentencing range would be 18–24 months.

## DISCUSSION

### A. *Applicable Law*

Section 3A1.1(b) of the Sentencing Guidelines provides for a two-level increase:

> [i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct. . . .

U.S. Sentencing Guidelines Manual § 3A1.1(b) (1997).[5] The enhancement "reflect[s] the public interest in more severely punishing those whose choice of victim demonstrates an 'extra measure of criminal depravity.'" *United States v. Hershkowitz,* 968 F.2d 1503, 1505 (2d Cir.1992) (quoting *United States v. Paige,* 923 F.2d 112, 113 (8th Cir.1991)). The commentary to the 1997 Guidelines explains further:

> Subsection (b) applies to offenses involving an unusually vulnerable victim in

---

5. As the conduct in question occurred principally from April through October 1998, the Guidelines in effect as of November 1, 1997, control. Indeed, both sides have relied on the 1997 version. (Gov't 3/11/01 Letter Br. at 2; Def. 3/7/01 Letter Br. at 4). The current version of the "vulnerable victim" enhancement is worded differently: "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." U.S. Sentencing Guidelines Manual § 3A1.1(b)(1) (2000).

which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

U.S. Sentencing Guidelines Manual § 3A1.1(b), cmt. 2 (1997).

■ In considering vulnerability, courts have focused "not on the likelihood or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect himself from the crime." *United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir.1997) (citation omitted); *accord United States v. Kaye*, 23 F.3d 50, 54 (2d Cir.1994) ("[C]ourts appear to have interpreted 'susceptible to the criminal conduct' as emphasizing that a particular victim was less likely to thwart the crime, rather than more likely to suffer harm if the crime is successful"). In addition, § 3A1.1(b) does not require that the defendant choose the victim because of her or his vulnerability; it requires only that the defendant "knew or should have known of this quality when deciding to go ahead with the crime." *United States v. McCall*, 174 F.3d 47, 50 (2d Cir.1998) (citation omitted). The Court must consider "the totality of the circumstances, including the victim's physical and financial condition and the nature of the crime." *United States v. Borst*, 62 F.3d 43, 46 (2d Cir.1995).

In *McCall*, the Second Circuit observed that the courts have read two limits into § 3A1.1(b). First, the vulnerability of the victim must bear some nexus to the crime; in other words, the enhancement does not apply if the victim turns out to be vulnerable merely by chance, as in a fraud case where the victim turns out to be physically disabled but the disability had nothing to do with the crime. *McCall*, 174 F.3d at 50. Second, "the defendant generally must have singled out the vulnerable victim[ ] from a larger class of potential victims." *Id.*

■ The Court in *McCall* also cautioned that "broad generalizations about victims based upon their membership in a class are disfavored where a very substantial portion of the class is not in fact particularly vulnerable to the crime in question." *Id.* For example, age alone is generally not sufficient to support the enhancement. *Id.; see also O'Neil*, 118 F.3d at 75 (noting that "being elderly is alone insufficient to render an individual 'unusually vulnerable,' " but observing also that "courts frequently have found elderly individuals to be unusually vulnerable to telemarketing fraud schemes"). Consequently, in most cases, the vulnerable victim enhancement may be applied only on the basis of "individualized findings as to the vulnerability of particular victims." *McCall*, 174 F.3d at 50. Hence, the court must engage in "an examination of the individual victims' ability to avoid the crime rather than their vulnerability relative to other potential victims of the same crime." *Id.* at 51. The enhancement is to be applied "where an extra measure of deterrence and punishment is necessary because the defendant knew of a victim's substantial inability to avoid the crime." *Id.*

■ The Government has the burden of establishing the applicability of § 3A1.1(b). *United States v. Kirk*, 894 F.2d 1162, 1164 (10th Cir.1990); *see also United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir.1992) ("In the context of sen-

tencing, if the government seeks increased punishment, it has the burden of proving that the circumstances warrant such an increase."). At sentencing, it must prove disputed factual allegations by a preponderance of the evidence, *United States v. Shonubi*, 998 F.2d 84 (2d Cir.1993),[6] and it may do so by relying on hearsay evidence. *United States v. Weinberg*, 852 F.2d 681, 685 (2d Cir.1988) ("It has long been established that hearsay evidence is admissible at a sentencing hearing.").

## B. *Application*

In this case, one could make broad generalizations about the victims as a whole. In some respects, all of the victims of the fraud here were vulnerable. It is difficult to understand how members of the public would send thousands of dollars to strangers calling from far away. Openshaw, for example, lived in Utah. She had never met Sangemino. Yet, on the basis of their telephone calls, she sent $149,000—her life savings and more—to him in New York. But it was not just this 79–year old woman living by herself who fell for the scam. At the trial of Murray and Crawford, for example, several other victims of the scheme testified.

A 35–year old account manager for a technology company in Texas who had a college business degree invested $8,000. (Trial Tr. at 282, 287). A 54–year old executive for IBM living in New Jersey who had been trading stocks for some 22

years also sent in $8,000. (*Id.* at 56–57, 59). A 33–year old restauranteur with a college education invested $1,000. (*Id.* at 77–79). He was told First Fidelity would go public in June 1998. When it did not go public in June 1998, he telephoned the company to find out what happened—and he was talked into investing another $1,000. (*Id.* at 80–81). By December, the company still had not gone public and when he reached someone at First Fidelity again, the person tried to talk him into investing even more money. This time, he refused. (*Id.* at 82–84).[7] Whether because of greed or naivety or other human frailty, all of these individuals were vulnerable in some sense.

■ I do not, however, rely on generalizations about securities fraud victims or elderly individuals. Rather, I focus on the vulnerability of Openshaw in particular—whether, because of her individual circumstances, she was unusually vulnerable and, therefore, "was less likely to thwart the crime." I find that Openshaw was particularly susceptible to the criminal conduct, that her vulnerability bore a direct nexus to the crime, and that Sangemino singled her out from a larger class of potential victims.

The initial telephone call in the spring of 1998 may have been a "cold call" and Sangemino may not have known that he was dialing a 79–year old widow who lived alone who would welcome some friendly conversation. And if we were talking about a single investment, Sangemino

---

**6.** Sangemino argues that the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), requires the Government to prove a sentencing enhancement by proof beyond a reasonable doubt. Sangemino is incorrect. *See United States v. Garcia*, 240 F.3d 180, 183 (2d Cir.2001) ("We see nothing in the Court's holding in *Apprendi* ... that alters a sentencing judge's traditional authority to determine those facts relevant to selection of an appro-

priate sentence within the statutory maximum....").

**7.** On the other hand, Savilla Bare, a 62–year old widow from Michigan who also testified at trial, was solicited by defendants—not Sangemino—to make an investment. Although she would arguably fall into what some would argue is an "unusually vulnerable" group, she resisted and did not invest. (Trial Tr. at 419–27).

might have a strong argument that the enhancement should not apply. But the evidence demonstrates that Sangemino would have quickly learned that Openshaw was vulnerable, if he did not know already, because of her age and loneliness, and that she therefore was an easy mark. He also learned that she had substantial assets— "liquid cash" as well as stocks, insurance, and real property that she could liquidate. Thus, he singled her out from the other "leads" and called her repeatedly, taking advantage of her by falsely earning her trust and affection. He convinced her to invest not once or twice or even three times, but eleven times. The investments also increased in amount as he built up her trust—they went from $5,000 and $4,000 to $10,000 and eventually to $21,000 and $29,000. *See O'Neil,* 118 F.3d at 75 (upholding a vulnerable victims enhancement and noting that "an important part of the scheme was the re-loading process, whereby individuals who already had been victimized by the scheme were contacted up to two more times and defrauded into sending more money to the companies").

Here, Sangemino knew of Openshaw's "substantial inability to avoid the crime." *McCall,* 174 F.3d at 51. By repeatedly taking advantage of her vulnerability, he demonstrated an "extra measure of depravity," *Hershkowitz,* 968 F.2d at 1505, and deserves to be punished accordingly.

### CONCLUSION

Sangemino's objection to the two-level enhancement pursuant to Guidelines § 3A1.1(b) is overruled. The total offense level is 17; the criminal history category is III; the sentencing range is 30 to 37 months.

SO ORDERED.